**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| India Sellers,<br><br>*Plaintiff*,<br><br>v.<br><br>Fluor Intercontinental, Inc.; Fluor Government Group International, Inc.; and Alliance Project Services, Inc.<br><br>*Defendants*. | C.A. No.: _____<br><br><br>**PLAINTIFF'S ORIGINAL COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff India Sellers files this, her Original Complaint for Damages against Defendants Fluor Intercontinental, Inc., Fluor Government Group International, Inc. (collectively, "Fluor" or the "Fluor Defendants") and Alliance Project Services, Inc. ("APS"). In support, Plaintiff would respectfully show the Court the following:

## I.      OVERVIEW OF LAWSUIT

1.      On Saturday morning of November 12, 2016, more than 200 personnel residing at the Bagram Airfield (also referred to herein as the "Base") in Afghanistan were gathering for a Veterans Day 5K race set to begin at 6:15 a.m. The meeting point for the race was an area called the "Disney Clamshell." Also on the Base was man named Ahmad Nayeb, an Afghan national.

2.      Nayeb was an employee of Defendant APS and was primarily supervised and managed by the Fluor Defendants.

3.      Nayeb worked at Fluor's HAZMAT work center within Fluor's Non-Tactical Vehicle Yard at the Base.

4.      Nayeb was not supposed to be on the Base on the morning of November 12, 2016.

5.    Defendants were required to ensure that employees like Nayeb were physically escorted off the Base at the end of their work shifts. Nayeb was supposed to have been escorted off the Base by bus at 4:45 a.m. that morning. However, on the morning in question, Nayeb was not escorted off the Base at the end of his work shift.

6.    Prior to November 12, 2016, Nayeb had constructed an explosive vest bomb at Fluor's facility on the Base—a facility that Fluor had a duty to supervise and manage.

7.    Nayeb used materials and tools owned by Fluor to construct the explosive vest bomb at Fluor's work location on Base.

8.    On November 12, 2016, instead of being escorted off the Base by bus, Nayeb walked, totally unsupervised by the Defendants, toward the meeting point for the Veterans Day 5K race.

9.    That morning, a group of soldiers (including Plaintiff India Sellers) had gathered at the Clamshell, intending to conduct a combatives training class. Upon arrival, they saw that the 5K run would be taking place, as the organizers were preparing for the event. The soldiers decided to hold their training at another facility, so they left the Clamshell and began walking alongside Disney Drive towards the alternate location.

10.    Meanwhile, Fluor employees Jarrold Reeves and Peter Provost, both avid runners, left their quarters and headed towards the Clamshell for the 5K run. They also traveled alongside Disney Drive towards the Clamshell. It was still early in the morning, and it was dark.

11.    By all accounts, Nayeb intended to travel to the Clamshell and detonate his bomb among the hundreds of people who would be gathering there later that morning for the race.

12.    Nayeb attempted to hide between several concrete bunkers along the walkway. The group of soldiers and Reeves and Provost were approaching the bomber from different directions

and, unbeknownst to them, were converging on Nayeb. At some point, Nayeb realized that he would be caught and would not reach his intended target.

13.    Reeves and Provost were closest to Nayeb when he jumped up, faced them, and detonated his bomb. Reeves and Provost likely died immediately.

14.    The soldiers, also within 15 feet of Nayeb, took shrapnel directly from the bomb and also from shrapnel ricocheting off of the concrete bunkers.

15.    PFC Tyler Iubelt and Staff Sgt. John Perry were in the group of soldiers and were killed that day.

16.    Staff Sgt. Allan Brown was also in the group of soldiers, and he succumbed to his injuries several weeks later.

17.    Other soldiers who were in close proximity to the explosion, like Plaintiff India Sellers, sustained severe and life-altering injuries as a result.

18.    Nayeb detonated the vest bomb about 300 meters from the densely packed starting point of the 5K race. Although the bomber was prevented from reaching the start point of the race, six people were killed in the attack (three U.S. soldiers, two Fluor employees, and the bomber) and seventeen people were injured.

19.    This incident has caused the loss of fathers, sons, and spouses. This incident has dramatically altered the lives of several men and women who devoted their lives to military service.

20.    This incident was completely the result of Defendants' negligence and gross negligence. This lawsuit seeks to hold those responsible who allowed this incident, Fluor and APS, and to give them an opportunity to take responsibility for their grievous mistakes. Any attempt by

Defendants to place any blame on the U.S. Army or any other U.S. governmental entity for this tragedy would be shameful.

## II.     PARTIES

21.     **Plaintiff India Sellers** is an individual and resident of the State of Texas. At the time of the incident, Ms. Sellers was 25 years old.

22.     Both of Ms. Sellers's parents served in the military. She is a single mother of an eight-year-old son. Ms. Sellers enlisted in the Army in July 2010, and she deployed to Afghanistan from Fort Hood in September 2016.

23.     On the day of the incident, Ms. Sellers recalls walking with Lakeia Stokes, Maggie Bilyeu, and Addie Ford. She recalls waking up after the detonation, and she was on the ground. Medics immediately attended to her. She recalls being placed in a neck brace, being heavily wrapped in gauze, and being placed in an ambulance. She also recalls being in the ambulance with Ms. Stokes and Sgt. Allen Brown, and Sgt. Brown giving words of encouragement to her and Ms. Stokes, demanding that the medics focus on them.

24.     Ms. Sellers was taken to the Bagram hospital where she was stabilized and then flown to Germany. She next remembers waking up at Walter Reed Hospital. She was at Walter Reed until July 2017, where she received numerous surgeries to treat shrapnel wounds to her head, arm, abdomen, groin, leg, back, and eye.

25.     Ms. Sellers has undergone over 30 surgeries as a result of the explosion. At this time, she has major damage to her leg, resulting in constant swelling and difficulty walking. She is also blind in her left eye, and her left shoulder has metal rods holding it together and has limited range of motion. Additionally, she suffered a traumatic brain injury and suffers from recurring headaches.

26.    After leaving Walter Reed, Ms. Sellers was assigned to Fort Bragg, where her family is located. She was assigned to a wounded warrior unit and continued to receive extensive therapy. She retired from the Army in June 2018, and resides in Killen, Texas.

27.    Pursuant to 50 U.S.C. § 526(a), any statutes of limitations on Ms. Sellers' claims were tolled while she served in the military. Further, any statutes of limitations have been partially tolled pursuant to a tolling agreement between the parties and under the doctrine of equitable tolling.

28.    **Defendant Fluor Intercontinental, Inc.** is a California corporation with its principal place of business in Greenville County, in the State of South Carolina. It may be served through its registered agent for service in South Carolina: Corporation Service Company, 508 Meeting Street, West Columbia, South Carolina 29169.

29.    Fluor Intercontinental, Inc. is subject to the jurisdiction of this Court because its principal place of business is in Greenville, South Carolina, and it regularly conducts business in South Carolina, contracts to supply services in South Carolina, possesses real property in Greenville, South Carolina, and resides in Greenville, South Carolina.

30.    **Defendant Fluor Government Group International, Inc.** is a Delaware corporation, with its principal place of business in Greenville County, in the State of South Carolina. It may be served through its registered agent for service in South Carolina:  Corporation Service Company, 508 Meeting Street, West Columbia, South Carolina 29169.

31.    Fluor Government Group International, Inc. is subject to the jurisdiction of this Court because it has its principal place of business in Greenville, South Carolina, regularly conducts business in South Carolina, contracts to supply services in South Carolina, possesses real

property in Greenville, South Carolina, performed significant parts of the contracts at issue in this case in Greenville, South Carolina, and resides in Greenville, South Carolina.

32.    Defendants Fluor International, Inc. and Fluor Government Group International, Inc. are referred to collectively herein as "Fluor" or the "Fluor Defendants." The Fluor Defendants hold themselves out as a single business enterprise and operate as such. At all times material to this Complaint, Fluor had thousands of employees in Afghanistan, including at Bagram Airfield.

33.    Fluor is "properly regarded as a single entity" because there is "'an amalgamation of corporate interest, entities, and activities so as to blur the legal distinction between the corporations and their activities.'" *Pertuis v. Front Roe Restaurants, Inc.*, 423 S.C. 640, 651, 817 S.E.2d 273, 278 (2018) (quoting *Kincaid v. Landing Dev't Corp.*, 289 S.C. 89, 96, 344 S.E.2d 869, 874 (Ct. App. 1986)). Fluor's use of its subsidiaries and its subsidiaries' subsidiaries, its blurring of all entities into one, and its manipulation of the corporate form constitutes bad faith, abuse, fraud, wrongdoing, and injustice.

34.    Each Fluor Defendant in this case is therefore liable for the conduct and obligations of every other Fluor Defendant in this case.

35.    **Defendant Alliance Project Services, Inc**. is a Delaware corporation, with its principal place of business in the State of Virginia. It may be served through its President and Registered Agent, Tod E. Nickles, 19440 Golf Vista Plaza, Suite 360, Leesburg, VA 20176.

36.    Alliance Project Services, Inc. is subject to the jurisdiction of this Court because it regularly conducts and transacts business in South Carolina with South Carolina-based companies. Alliance Project Services, Inc. has contracted to supply services in South Carolina with South Carolina-based companies, including the contracts at issue in this lawsuit. Such contracts were to

be performed in whole or in part in South Carolina. One such contract involved the hiring of the bomber who was involved in the incident that forms the basis of this lawsuit.

37.    In the event any parties are misnamed or are not included herein, it is Plaintiff's contention that such was a misidentification or misnomer. To the extent any of the defendants are conducting business pursuant to a trade name or assumed name, then suit is brought against such Defendant and Plaintiff demands that, upon answer to the Complaint, that Defendants answer in their correct legal and assumed names.

### III.    JURISDICTION AND VENUE

38.    The Court has federal subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

39.    The Court also has personal jurisdiction over the parties to this lawsuit.

40.    Venue is proper as to all Defendants under 28 U.S.C. § 1391 and assignable to the Greenville Division under Local Civil Rule 3.01 DSC.

41.    South Carolina law applies to Plaintiff's claims for relief in this case.

### IV.    FACTUAL BACKGROUND

42.    Plaintiff incorporates the above paragraphs as if set forth in full below.

**A.    The Incident**

43.    As noted above, in the early morning hours of November 12, 2016, a man named Ahmad Nayeb detonated a bomb at the Bagram Air Base in Afghanistan. As a result of the incident, three U.S. soldiers were killed (Tyler Iubelt, John Perry, and Allan E. Brown), two contractors were killed (Jarrold Reeves and Peter Provost), sixteen U.S. soldiers (including India Sellers) were

injured, and one Polish solider was injured. The incident was a result of the negligence and gross negligence of Defendants.

**B.**     **The Roles and Responsibilities of the Defendants**

44.    The Fluor Defendants voluntarily participate in a government contracting program known as the Logistics Civil Augmentation Program ("LOGCAP"). LOGCAP was created in 1985 by Army Regulation 700–137 that anticipated the use of civilian contractors in wartime situations.

45.    In April 2008, the U.S. Department of Defense awarded the fourth generation of support contracts, known as LOGCAP IV, to three contractors, including Fluor Intercontinental.

46.    Fluor agreed to abide by the terms of LOGCAP IV (including the Statements of Work, Performance Work Statements, Task Orders, and Letters of Technical Direction issued under LOGCAP IV) and the Bagram Airfield Base Policies (the "LOGCAP Materials").

47.    The LOGCAP Materials constitute contracts with the U.S. Government and set forth the framework within which Fluor was required to perform.

48.    In July 2009, Fluor Intercontinental was awarded Task Order 005, a cost-plus-award-fee contract. Task Order 005 encompassed services and base life support for the eastern and northern sections of the Islamic Republic of Afghanistan.

49.    Though Fluor Intercontinental is the party to the contracts at issue in this case, Fluor Government Group is the "employer" of some of the personnel or "representatives" carrying out the contractual obligations in Afghanistan.

50.    Fluor and APS entered into contracts for, among other things, for APS to provide personnel services, under Task Order 005.

51.    As the prime contractor under the LOGCAP Materials, the Fluor Defendants controlled and were responsible for the Non-Tactical Vehicle Yard and the personnel working there. APS employed several people working in that area, including the bomber.

52.    Nayeb was employed by and hired through APS, which administered payroll, time, and attendance for Nayeb, but his work activities were generally managed and supervised by the Fluor Defendants.

53.    Under the LOGCAP Materials, Defendants were "responsible for oversight of [local nationals and subcontractor personnel] to ensure compliance with all terms of the [LOGCAP Materials]."

54.    Under the LOGCAP Materials, Defendants were "responsible for ensuring all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the Performance Work Statement] and the Basic Contract."

55.    However, Defendants grossly failed to meet these responsibilities, among others. As a result of Defendants' negligent management and supervision of Nayeb, he was able to construct a bomb, using equipment and material provided by the Defendants.

56.    Nayeb was also able to roam the Base unsupervised, despite Fluor's contractual agreement to monitor and escort him on the Base, and to ensure he left the Base when his work shift ended.

**C.    Events Leading up to the Bombing**

57.    In the months leading up to the incident, Nayeb worked at Fluor's "HAZMAT" work center. From August 6, 2016 until November 12, 2016, Nayeb worked the night shift (6:00 p.m. to 6:00 a.m.) at the HAZMAT work center.

1.    Defendants Failed to Supervise Nayeb

9

58.    While on the night shift, including the shift ending on November 12, 2016, Nayeb worked alone and unsupervised at the HAZMAT work center.

59.    Based on interviews by Army investigators after the incident, it was clear that Defendants did not supervise the bomber and were confused as to who was responsible for supervising the bomber.

### 2.    Defendants Negligently Retained Nayeb

60.    Oftentimes, Nayeb wandered away from his worksite and was unaccounted for. He had also been caught doing personal work during work hours, sleeping on the job, and reading the Quran while on the job.

61.    The LOGCAP IV Afghanistan HCN19 Labor Support Statement of Work provides that sleeping while at work or unsatisfactory job performance are "cause for disciplinary action up to and including termination."

62.    However, Defendants did not fire Nayeb, but instead retained him. It does not appear that he was ever reprimanded for his poor work performance.

63.    As a result of Defendants' negligence, Nayeb was allowed to keep his job and remain on the Base, and he was permitted to continue his efforts to build, and ultimately detonate, a bomb.

### 3.    Defendants Negligently Provided Tools and Materials to Nayeb

64.    Defendants also allowed Nayeb to check out certain tools and equipment, including tools and equipment that were not remotely necessary for his job.

65.    Nayeb checked out a "multimeter" at least nine times in the three months before the incident. A multimeter is a tool used to measure electrical voltage, current, and resistance.

66.    Nayeb had no need to use a multimeter for his actual job. Instead, he used this multimeter to build a bomb.

67.    Prior to the incident, Fluor policies stated that only Fluor LOGCAP personnel were authorized to check out tools from Defendants' tool room at the Non-Tactical Vehicle Yard. Based on interviews by Army investigators, however, it became clear that Defendants' employees did not know the policy. Some believed that "any employee was able to check out any tool, regardless of where that employee worked." Others reported that, "only the person who needed the tool could sign the tool in or out from the tool room."

68.    Twice, Defendants' tool room supervisor asked Nayeb why he needed a multimeter during work. Nayeb once replied that he needed a multimeter to fix a radio. Another time, Nayeb replied that he needed a multimeter to fix hair clippers. Neither of these stated reasons for checking out the multimeter were related to his job at the HAZMAT work center, and Defendants did nothing to determine whether Nayeb's stated reasons for checking out a multimeter were true.

69.    Nayeb used other material from the Fluor worksite to construct the bomb.

70.    The string used to assemble the vest bomb was a forensic match to string found at Nayeb's worksite. Fluor owned the string the bomber used to assemble the vest bomb.

71.    Fluor also owned the components used as projectiles in the vest bomb. The bomber got the projectiles used in the vest bomb from Fluor.

72.    Army investigators found components (nuts and bolts) similar to the components the bomber used as projectiles in the vest bomb at the bomber's worksite. Those nuts and bolts were not necessary for any job duties Nayeb had at the HAZMAT work center.

73.     The switch used to trigger the vest bomb was similar to switches that were readily available and unaccounted for in a trash container at Nayeb's worksite. Fluor owned the switch used to trigger the vest bomb.

74.     As a result of Defendants' complete failure to supervise and monitor the bomber, Defendants failed to detect his suspicious use of tools and material unnecessary to Nayeb's job duties at the HAZMAT work center. Because of this, Nayeb was able to use those tools and materials to build a bomb.

        4.      Defendants Negligently Failed to Escort Nayeb

75.     Under the LOGCAP Materials, Defendants were responsible for providing the "transportation and supervision" for its local national employees, including Nayeb.

76.     Defendants' transportation and supervision responsibilities included the transportation and supervision of its local national employees, including Nayeb, from the Entry Control Point to the Non-Tactical Vehicle Yard at the beginning of each shift and from the Non-Tactical Vehicle Yard to the Entry Control Point at the end of each shift.

77.     Defendants were required to provide employees to serve as escorts for local nationals who worked in the Non-Tactical Vehicle Yard, including Nayeb.

78.     Defendants' escorts did not remain in close proximity or remain in constant view of the individuals they were escorting, including Nayeb.

79.     Instead, Defendants used a sign in/sign out sheet filled out by the night shift Local Team Lead. The Local Team Lead did not visually ensure that every local national employee got on the bus to leave the Base, as was required.

80.     Instead, the Local Team Lead merely observed which employees had signed the sheet claiming to have boarded the bus to leave the Base.

81.     Defendants' employees thus relied on the local nationals themselves, including Nayeb, to ensure that local nationals were accounted for and on the bus at the end of each shift.

82.     Fluor changed its Non-Tactical Vehicle Yard escorts every week. As a result, Defendants' escorts did not know the names of the local national employees they were supposed to be escorting.

83.     On November 11, 2016, Nayeb told another local national employee that he would miss the bus on November 12, 2016 because of a HAZMAT class requirement. Defendants did nothing to attempt to ascertain the truth of that statement or to supervise or monitor the whereabouts of Nayeb thereafter.

84.     In fact, Nayeb did not have a HAZMAT class requirement to attend on November 12, 2016. He had taken the class only a month before on October 2, 2016 and did not require the class for another year.

85.     On November 12, 2016, Nayeb did not show up to be escorted off the Base. Defendants did nothing in response to Nayeb's failure to appear for escort off the Base on the morning of the bombing.

86.     Defendants failed to alert the Army or Base officials to the bomber's absence from the escort bus on November 12, 2016.

87.     Defendants' negligence and gross negligence allowed Nayeb to travel alone towards the Disney Clamshell with a bomb on November 12, 2016, and to ultimately detonate the bomb.

88.     In summary, Defendants' acts and omissions allowed Nayeb to construct and detonate a bomb which killed five people and grievously injured at least seventeen more, including Plaintiff.

D.    The Army Had No Involvement

89.    The U. S. Army did not authorize Defendants' actions at issue in this case.

90.    The U.S. Army did not have complete, direct, or actual control over Defendants when Defendants' employee, Nayeb, attacked the Army and detonated the bomb at Bagram on November 12, 2016.

91.    The U.S. Army had no involvement in hiring, managing, supervising, or retaining Nayeb.

92.    The U.S. Army did not direct Defendants in any way with respect to Defendants' retention, management, and supervision of Nayeb.

93.    The U.S. Army did not have complete, direct, or actual control over the supervision of Nayeb—Defendants did.

94.    The U.S. Army did not have complete, direct, or actual control over Defendants' Non-Tactical Vehicle Yard or Defendants' HAZMAT work center—Defendants did.

95.    Defendants' supervision of the Non-Tactical Vehicle Yard was not a combat activity.

96.    Defendants' supervision of the HAZMAT center, the disposal of motor oil from servicing non-tactical vehicles, was not a combat activity.

97.    The U.S. Army had no involvement in the decision to allow Nayeb access to tools and materials.

98.    The U.S. Army did not have complete, direct, or actual control over Defendants' employee, Nayeb, when he constructed the vest bomb at the worksite that Defendants controlled, using their tools and materials, during the work hours of his job for Defendants.

99.    The U.S. Army had no involvement in the failure to properly escort Nayeb.

100.    The U.S. Army did not have complete, direct, or actual control over Defendants when Defendants' employee, Nayeb, detonated his bomb on November 12, 2016.

101.    Defendant was not integrated into the military's chain of command such that the military retained command authority over Defendants' supervision of the Non-Tactical Vehicle Yard and Defendants' LOGCAP personnel, including Nayeb.

102.    No military decisions supposedly governing Defendants' conduct required that Defendants commit the acts and omissions referenced herein.

103.    Defendants' conduct was not governed by military decisions when Defendants violated specific decisions, policies, and provisions of the LOGCAP Materials and Base policies.

104.    The events leading up to the incident have absolutely zero to do with the U.S. Government's provision of security on the Base.

105.    Defendants' negligence and gross negligence was the result of discretionary decisions by Defendants alone.

106.    Any attempt by Defendants to blame the U.S. Army or any other U.S. governmental entity for this tragedy would be shameful. This incident was completely the result of Defendants' negligence and gross negligence.

E.    <u>The Army Investigation</u>

107.    The U.S. Army conducted an AR 15-6 Investigation of the bombing (the "Army Investigation"). The factual findings and conclusions of the Army Investigation were reported in an Army Report dated December 31, 2016, issued by a Major General of the U.S. Army.

108.    The Army Investigation established that Defendants were negligent in four separate ways, each of which violated Fluor's contractual obligations to the U.S. Government:

      a.    Fluor negligently failed to supervise Nayeb at the HAZMAT work center;

b. Fluor negligently entrusted Nayeb with tools he used to construct the vest bomb;

c. Fluor negligently supervised Nayeb's escort on and off the Base; and

d. Fluor negligently retained Nayeb after known poor job performance.

109. Additionally, the Army Investigation established, among other things, that:

a. Nayeb worked alone and unsupervised during the night shift at the HAZMAT work center where his job was to dispose of automotive materials such as motor oil.

b. Three different Fluor supervisors could have and should have supervised Nayeb's work at the HAZMAT work center.

c. Each of the three Fluor supervisors told Army investigators that he did not supervise Nayeb at the HAZMAT work center.

d. Each of the three Fluor supervisors either denied responsibility or blamed one another for leaving Nayeb completely unsupervised while he worked alone at his worksite constructing the vest bomb.

e. The Army Investigation concluded, "This ambiguity on supervisory responsibility demonstrates an unreasonable complacency by Fluor to ensure Local National employees were properly supervised at all times, as required by their contract and non-contractual, generally recognized supervisor responsibility."

f. Nayeb's job at the HAZMAT work center did not require tools at all. Yet, Fluor allowed the bomber to frequently check out unnecessary and suspicious tools from the Fluor tool room.

g. Nayeb used Fluor's tools to construct the bomb at his worksite.

h. Among the tools that Nayeb obtained from Fluor was a "multimeter," which is a tool used to measure electrical voltage, current, and resistance, and is useful for building a bomb.

i. Nayeb used Fluor materials from the Non-Tactical Vehicle Yard as the components and projectiles of the vest bomb.

j. There was no reason for Nayeb to have access to the Fluor materials and the Fluor tools that he used to construct the vest bomb. None of these were required for him to do his job at the HAZMAT work center.

k. The Army investigation concluded that the "lack of reasonable supervision facilitated Nayeb's ability to freely acquire most of the components necessary for

the construction of the suicide vest and the freedom of movement to complete its construction."

l.  The Bagram Airfield Badging and Screening Policy required Fluor escorts to "remain in close proximity and remain in constate view of the individuals they are escorting."

m.  In practice, Fluor ignored the Bagram escort policies.

n.  Fluor did nothing when Nayeb did not show up for escort off the Base the morning of the attack.

o.  "Fluor's systematic lack of reasonable supervision enabled Nayeb to go undetected from 0445 until 0538 on 12 November 2016, which coincides with the average walking time of 53 minutes from the Non-Tactical Vehicle Yard to the blast site."

p.  Nayeb's work performance warranted disciplinary action or termination well before the bombing occurred.

q.  Fluor's "failure to enforce a work-related standard of performance and the unjustified retention of Nayeb amounts to a lack of reasonable supervision[.]"

110.   The entirety of the Army Report is admissible in evidence for all purposes under Federal Rule of Evidence 803(8).

## V.    CAUSES OF ACTION AGAINST FLUOR DEFENDANTS: NEGLIGENCE/GROSS NEGLIGENCE

111.   Plaintiff incorporates the above paragraphs as if set forth in full below.

112.   The Fluor Defendants owed the Plaintiff a duty of ordinary care. In the lead up to the explosion, the Fluor Defendants, by and through their officers, employees, agents, and representatives, committed acts of omission and commission, which collectively and severally constituted negligence and gross negligence. The Fluor Defendants' imprudent acts and omissions included, but were not limited to:

a.  failing to use ordinary care in employing, supervising, managing, and/or retaining Nayeb;

b.  failing to properly escort Nayeb to and from his workstation and the exit point of the Base;

c. failing to control access of their equipment and materials;

d. negligently permitting Nayeb access to tools and equipment; and

e. such other acts of negligence and gross negligence as will be shown at trial.

113. The Fluor Defendants' negligent employment, supervision, entrustment, retention, and control were the direct and proximate cause of Nayeb being able to assemble and detonate the suicide bomb at the Base on November 12, 2016.

114. Said acts of negligence and gross negligence were the proximate cause of the injuries and damages sustained by the Plaintiff.

115. Further, the Fluor Defendants' actions were knowing, reckless, and/or malicious and, when viewed objectively from the Fluor Defendants' standpoint, involve an extreme degree of risk considering the probability and magnitude of potential harm to others. The Fluor Defendants had subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, and/or welfare of others. Therefore, Plaintiff seeks punitive damages against the Fluor Defendants.

## VI.    CAUSES OF ACTION AGAINST DEFENDANT APS: NEGLIGENCE/GROSS NEGLIGENCE

116. Plaintiff incorporates the above paragraphs as if set forth in full below.

117. Defendant APS owed Plaintiff a duty of ordinary care. In the lead-up to the explosion, Defendant APS, by and through its officers, employees, agents, and representatives, committed acts of omission and commission, which collectively and severally constituted negligence and gross negligence. Defendant APS's imprudent acts and omissions included, but were not limited to:

a. failing to use ordinary care in employing, supervising, managing, and/or retaining Nayeb;

    b.   failing to properly escort Nayeb to and from his workstation and the exit point of the Base;

    c.   failing to control access of its equipment and materials;

    d.   negligently permitting Nayeb access to tools and equipment; and

    e.   such other acts of negligence and gross negligence as will be shown at trial.

118.    Defendant APS's negligent employment, supervision, entrustment, retention, and control were the direct and proximate cause of Nayeb being able to assemble and detonate the suicide bomb at the Base on November 12, 2016.

119.    Said acts of negligence and gross negligence were the proximate cause of the injuries and damages sustained by the Plaintiff.

120.    Further, Defendant APS's actions were knowing, reckless, and/or malicious and, when viewed objectively from Defendant APS's standpoint, involved an extreme degree of risk considering the probability and magnitude of potential harm to others. Defendant APS had subjective awareness of the risks involved, but nevertheless proceeded in conscious indifference to the rights, safety and/or welfare of others. Therefore, Plaintiff seeks punitive damages against Defendant APS.

### VII.   CAUSE OF ACTION AGAINST FLUOR AND APS: <u>BREACH OF CONTRACT</u>

121.    Plaintiff incorporates herein the preceding paragraphs.

122.    Fluor entered into contracts, including the LOGCAP Materials, with the U.S. Government. Additionally, APS and Fluor entered into contracts which adopted and incorporated the LOGCAP Materials.

123.    Defendants had a duty under the contracts to supervise their employees.

124.     Defendants had a duty to ensure that all personnel supporting Defendants' work under the LOGCAP Materials complied with the standards of conduct and all the terms and conditions of the contracts.

125.     The LOGCAP Materials were intended to directly benefit members of the United States Armed Forces and soldiers at Bagram Airfield, including Plaintiff.

126.     Members of the United States Armed Forces, including Plaintiff, were the intended third-party beneficiaries of these contracts.

127.     Defendants intended the LOGCAP Materials to benefit individual U.S. soldiers.

128.     Defendants breached the contracts by violating the specific provisions noted in this Complaint, among others.

129.     Specifically, Defendants did not meet their contractual obligations to reasonably supervise Nayeb when they allowed Nayeb to check out tools from the tool room, including tools unnecessary to his job, that he used to construct the vest bomb.

130.     Defendants did not meet their contractual obligations to reasonably supervise Nayeb.

131.     Defendants did not meet their contractual obligations when they violated the Base access control policy by failing to escort Nayeb off the Base on November 12, 2016 and by failing to have proper escorts remain in close proximity to and in constant view of Nayeb when escorting him.

132.     Defendants' breaches of the contracts enabled the bomber's attack and proximately caused the deaths of five innocent people and the injuries to seventeen innocent people, including Plaintiff.

## VIII.   DAMAGES

133.   Compensatory Damages: As a direct and proximate result of the Defendants' acts and omissions described above, Plaintiff India Sellers has incurred one or more of the following categories of damages: conscious physical and mental pain, suffering, and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic, and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

134.   Punitive Damages:   Defendants' failure to properly supervise Nayeb at this workplace, entrustment of tools to Nayeb, decision to retain and promote Nayeb after known poor performance, failure to ensure that he was escorted off the Base, and allowing Nayeb to wander the Base was unreasonably dangerous, was intentional, and was motivated primarily by financial gain.

135.   Defendants' misconduct described in this Complaint was so wanton and reckless it warrants and demands the imposition of substantial punitive damages against Defendants' pursuant to S.C. Code Ann. § 15-32-530.

## IX.   PRESERVATION OF EVIDENCE

136.   Plaintiff requests and demands that each Defendant preserve and maintain all evidence pertaining to any claim or defense related to the incident made the basis of this lawsuit or the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance or security tapes, business or medical records, incident reports, bills, telephone call slips or records, correspondence, facsimiles, email, voicemail, text messages, any evidence involving

the incident in question, and any electronic image or information related to the referenced incident or damages.

## X.    **DEMAND FOR JURY TRIAL**

137.    Plaintiff respectfully demands a jury trial and has tendered the appropriate fee.

## **PRAYER**

WHEREFORE, Plaintiff India Sellers prays for judgment against Defendants Fluor Inter-continental, Inc., Fluor Government Group International, Inc., and Alliance Project Services, Inc. for all such other damages, plus exemplary and punitive damages; plus pre-judgment and post-judgment interest as allowed by law; all costs of court; and all such other and further relief, at law and in equity, to which Plaintiff may be justly entitled.

*Signature Page Follows*

Respectfully submitted,

  /s/ John B. White, Jr.
John B. White, Jr. (Fed. ID No. 04619)
Marghretta H. Shisko (Fed. ID No. 11601)
Griffin L. Lynch (Fed. ID No. 09580)
HARRISON WHITE, P.C.
178 West Main Street
P.O. Box 3547 (29304)
Spartanburg, SC 29306
(864) 585-5100
jwhite@spartanlaw.com
mshisko@spartanlaw.com
glynch@spartanlaw.com


Anthony G. Buzbee (State Bar No. 24001820)*
Peter K. Taaffe (State Bar No. 24003029)*
THE BUZBEE LAW FIRM
JP Morgan Chase Tower
600 Travis, Ste. 7300
Houston, Texas 77002
Telephone:  (713) 223-5393
Facsimile: (713) 223-5909
tbuzbee@txattorneys.com
ptaffe@txattorneys.com

*Pro Hac Vice Applications Forthcoming


**ATTORNEYS FOR PLAINTIFF**

April 13, 2021

Spartanburg, SC